STATE OF NORTH CAROLINA v. NAEEM MAURICE EZELL, DEFENDANT

No. COA02-448

(Filed 15 July 2003)

**1. Appeal and Error— preservation of issues—constitutional issue—raised below but not in exact words**

Double jeopardy was raised in the trial court, even though the exact words were not used, where the substance of the argument was sufficiently presented and was addressed by the court.

**2. Constitutional Law— double jeopardy—analysis**

The double jeopardy analysis in *Blockburger v. United States*, 284 U.S. 299, (proof of a fact not present in each offense) is an aid to determining legislative intent in that it creates a presumption that may be rebutted by a clear indication of legislative intent.

**3. Constitutional Law— double jeopardy—assault**

A defendant's conviction for both assault with a deadly weapon inflicting serious injury under N.C.G.S. § 14-32 and assault inflicting serious bodily injury under N.C.G.S. § 14-32.4 violated double jeopardy. N.C.G.S. § 14-32.4 punishes an assault inflicting serious bodily injury as a Class F felony "unless the conduct is covered under some other provision of law providing greater punishment." N.C.G.S. § 14-32 is a Class E felony, which carries a more severe punishment.

Appeal by defendant from judgments entered 14 November 2001 by Judge W. Douglas Albright in Hertford County Superior Court. Heard in the Court of Appeals 29 January 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Daniel D. Addison, for the State.*

*Winifred H. Dillon, for defendant-appellant.*

HUDSON, Judge.

Defendant Naeem Maurice Ezell was indicted, convicted, and sentenced for (1) assault with a deadly weapon with intent to kill inflicting serious injury (No. 01 CRS 920) and (2) assault inflicting serious bodily injury (No. 01 CRS 2881), in the same trial and for a single incident. He appealed, contending that his right to be free from

double jeopardy, guaranteed by the United States and North Carolina constitutions, was violated when he was punished for both offenses. We agree and reverse.

## BACKGROUND

The evidence presented at trial tended to show that defendant went to a bar called Chubbie's on March 15, 2001. There he saw Donnita Taylor, his former girlfriend, who had gone to the bar with some co-workers to celebrate a promotion. Defendant and Taylor, who have a child together, went to the parking lot to talk. Defendant asked Taylor to leave with him, but she refused. Defendant then threw a beer bottle at Taylor and walked away.

Taylor had two drinks at the bar and then left around 2 a.m. She arrived home alone around 3 a.m. Defendant came to her home sometime after that. When she opened the door, defendant hit her and knocked her over the back of the couch. He then pulled her to the floor and kicked her. Taylor lost consciousness and, when she came to, was lying on the bed in her son's bedroom. She saw a pail next to the bed that contained vomit and blood. Taylor asked defendant, who was sitting across the room, to summon help. She blacked out again. When she regained consciousness, emergency personnel had arrived.

Ann Revelle, an emergency medical technician with the Hertford County Emergency Medical Service ("EMS"), responded to the call. She found Taylor lying on her side in a fetal position on a bed. Revelle testified that Taylor was in excruciating pain and was vomiting. The EMS transported Taylor to the local hospital, where she underwent surgery to repair a lacerated liver. Dr. Khan, who performed the surgery, testified that Taylor was in a lot of pain and that if the torn liver had not been repaired, Taylor could have bled to death. He also testified that the injury could have caused a build-up of chemical and bile, which could have resulted in life-threatening chemical peritonitis and infection.

At trial, defendant testified that he was living in the home with Taylor on the date of the incident. At about 10 p.m. on March 15, he went to the house, but Taylor was not there. Defendant spoke with Taylor's mother, who informed him that Taylor had gone out with some friends. Defendant went to a house located in front of Chubbie's and found Taylor there, upstairs. She came downstairs to talk to defendant, who asked her to come home. Taylor walked away, and defendant left. Defendant denied throwing a bottle at Taylor.

Defendant testified that he then drove around until approximately 1:30 a.m and then returned to Taylor's house. Taylor was not there, nor was she at her mother's house. Finally, about 3:30 a.m., defendant went to the home again. Taylor opened the door when he knocked. She accused defendant of being out all night with another woman, and an argument ensued. Defendant testified that Taylor, who was intoxicated, put her hands in his face, and he pushed them away. Defendant admitted that he pushed Taylor in the course of the argument and that at some point Taylor began to vomit and asked defendant to call a doctor. After some delay, defendant went to the store across the street and called an ambulance. Defendant denied punching or kicking Taylor.

Defendant was indicted in September 2001 for assault with a deadly weapon with intent to kill inflicting serious injury, pursuant to N.C. Gen. Stat. § 14-32(a), and assault inflicting serious bodily injury, pursuant to § 14-32.4. He was also indicted in October 2001 as a habitual felon. At trial, the jury convicted defendant of both assault offenses. Subsequently, the same jury found him to be an habitual felon.

The trial court sentenced defendant to prison for a minimum of 144 months and a maximum of 182 months for the assault with a deadly weapon inflicting serious injury. The court also sentenced defendant to a prison term of 96 months to 125 months for the assault inflicting serious bodily injury, to run consecutively. Defendant now appeals.

## ANALYSIS

Defendant argues on appeal that he received multiple punishments for the same offense in violation of constitutional prohibitions against double jeopardy. Specifically, he contends that he was punished twice for the assault on Taylor, once when he was convicted and sentenced for assault with a deadly weapon with intent to kill inflicting serious injury, pursuant to N.C. Gen. Stat. § 14-32(b), and again when he was convicted and sentenced for assault inflicting serious bodily injury, under § 14-32.4. We agree.

## A.

[1] Before reaching the merits, we must address the State's contention that defendant failed to raise the issue of double jeopardy before the trial court and that, as a result, he is precluded from raising that issue now. To preserve a question for appellate review, a

party must have presented a timely request, objection, or motion to the trial court and have obtained a ruling thereon. N.C. R. App. Proc. 10(b)(1). We have carefully reviewed the transcript in this case. Although defendant did not raise his double jeopardy argument using those exact words, the substance of the argument was sufficiently presented and, more importantly, addressed by the trial court in finalizing its instructions to the jury. Accordingly, we proceed to the merits of defendant's argument.

B.

**[2]** Defendant contends that his conviction violates his right to be free from double jeopardy, as protected by both the Fifth Amendment of the United States Constitution and Article I, Section 19 of the North Carolina Constitution. The Fifth Amendment to the United States Constitution provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." Article I, section 19 of the North Carolina Constitution does not expressly prohibit double jeopardy, but the courts have included it as one of the "fundamental and sacred principle[s] of the common law, deeply imbedded in criminal jurisprudence" as part of the "law of the land." *State v. Ballard,* 280 N.C. 479, 482, 186 S.E.2d 372, 373 (1972) (internal quotations omitted).

The double jeopardy clause prohibits (1) a second prosecution for the same offenses after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple convictions for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 23 L. Ed. 2d 656 (1969); *State v. Gardner,* 315 N.C. 444, 451, 340 S.E.2d 701, 707 (1986). We are concerned here with the third category, as defendant alleges that he received multiple punishments for the same offense.

For decades, the Supreme Court of the United States has applied what has been called the *Blockburger* test in analyzing multiple offenses for double jeopardy purposes. The Court in *Blockburger v. United States,* 284 U.S. 299, 76 L. Ed. 306 (1932), held as follows:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.

*Id.* at 304, 76 L. Ed. at 309. If what purports to be two offenses is actually one under the *Blockburger* test, double jeopardy prohibits

prosecution for both. *Brown v. Ohio*, 432 U.S. 161, 166, 53 L. Ed. 2d 187 (1977).

However, as the Supreme Court made clear in *Missouri v. Hunter*, double jeopardy does not prohibit multiple punishment for two offenses—even if one is included within the other under the *Blockburger* test—if both are tried at the same time and the legislature intended for both offenses to be separately punished. *Hunter*, 459 U.S. 359, 368-69, 74 L. Ed. 2d 535 (1983); *see also Gardner*, 315 N.C. at 454-55; 340 S.E.2d at 709. In other words, the "Double Jeopardy Clause plays only a limited role in deciding whether cumulative punishments may be imposed under different statutes at a single criminal proceeding—that role being only to prevent the sentencing court from prescribing greater punishments than the legislature intended." *Gardner*, 315 N.C. at 460, 340 S.E.2d at 712. "Where our legislature 'specifically authorizes punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishments under such statutes in a single trial." *Id., citing Hunter*, 459 U.S. at 368-69, 74 L. Ed. 2d at 544. Moreover, as our Supreme Court explained in *Gardner*:

> [T]he presumption raised by the *Blockburger* test is only a federal rule for determining legislative intent as to violations of federal criminal laws and is neither binding on state courts nor conclusive. When utilized, it may be rebutted by a clear indication of legislative intent; and, when such intent is found, it must be respected, regardless of the outcome of the application of the *Blockburger* test. That is, even if the elements of the two statutory crimes are identical and neither requires proof of a fact that the other does not, the defendant may, in a single trial, be convicted of and punished for both crimes if it is found that the legislature so intended.

*Id.* at 455, 340 S.E.2d at 709, citing *Hunter*, 459 U.S. 359, 74 L.Ed.2d 535.

In *Gardner*, the North Carolina Supreme Court examined the subject, language, and history of the two statutes at issue to determine legislative intent. In concluding that the legislature intended that defendants could be punished for both felony larceny and breaking or entering, the Court noted that the two offenses each address "separate and distinct social norms," the breaking into or entering the

property of another and the stealing and carrying away of another's property. *Id.* at 461, 340 S.E.2d at 712. Moreover, the fact that the two offenses were placed in different subchapters of the criminal code was further indication that the legislature intended that the two crimes be separate. *Id.* at 462, 340 S.E.2d at 713. The Court also explained that it had uniformly and frequently held since the turn of the century that the two offenses are distinct crimes. In sum, the Court did not believe that "our legislature intended that the crime of breaking or entering should subsume the co-equal crime of felony larceny committed pursuant to the breaking or entering." *Id.* at 463, 340 S.E.2d at 714.

Similarly in *State v. Pipkens*, 337 N.C. 431, 446 S.E.2d 360 (1994), the North Carolina Supreme Court held that the defendant's convictions and punishments for trafficking in cocaine by possession and felonious possession of cocaine, based on the same contraband, did not violate the principles of double jeopardy. The Court first examined the intent and policy considerations behind each provision, holding that each was separate and distinct. The offense of felonious possession of cocaine is prohibited because the "possession by any person of any amount of controlled substances is against the public's interest, presumably because it enhances the potential for use of the substance, either by the possessor or by a person to whom the possessor distributes it." *Id.* at 434, 446 S.E.2d at 362. In contrast, the offense of trafficking in cocaine by possession was "responsive to a growing concern regarding the gravity of illegal drug activity in North Carolina and the need for effective laws to deter the corrupting influence of drug dealers and traffickers." *Id.* (citation and quotation marks omitted). Unlike possession, which "combats the perceived evil of individual possession of controlled substances," the trafficking statute is intended to prevent the large-scale distribution of controlled substances to the public. *Id.* at 434, 446 S.E.2d at 362-63. Thus, the Court held that "[b]ecause the perceived evils these statutes attempt to combat are distinct, we conclude that the legislature's intent was to proscribe and punish separately the offenses of felonious possession of cocaine and of trafficking in cocaine by possession." *Id.* at 434, 446 S.E.2d at 363.

We are aware of the North Carolina Supreme Court's decision in *State v. Fernandez*, 346 N.C. 1, 484 S.E.2d 350 (1997). There, the Supreme Court addressed, in dicta, whether double jeopardy precluded punishing the defendant for both first-degree murder and first-degree kidnapping where the kidnapping charge was elevated to

first degree based on the murders. In reaching the conclusion that the defendant's sentence for both offenses was constitutional, the Court followed *Blockburger* and looked at whether each of the two crimes contained an element not required to be proved in the other. *Id.* at 19, 484 S.E.2d at 361. An "analysis of legislative intent [was] not necessary," the Court explained, "because the offenses at issue are not the same." *Id.*

However, this Court recently cited *Fernandez, Gardner, and Blockburger* in *State v. Bailey*, 157 N.C. App. 80, 577 S.E.2d 683(2003), and concluded that the presumption raised by the *Blockburger* test can be rebutted by a "clear indication of legislative intent" and that such intent must be "respected, regardless of the outcome of the *Blockburger* test." *Id.* at 86, 577 S.E.2d at 688. The Court in *Bailey* then held, based on the legislature's intent to create separate offenses of possession of stolen property under G.S. § 14-71.1 and possession of a stolen vehicle under G.S. § 20-100, that although the "defendant could have been indicted and tried [for both] based on his possession of the stolen [vehicle], he could only have been convicted once for possession of it." *Id.*

After careful analysis, we conclude that the present case is analogous *to Bailey* and not *Fernandez*. Here, N.C. Gen. Stat. § 14-32.4 contains specific language indicating that the legislature intended that § 14-32.4 apply only in the absence of other applicable provisions. Section 14-32.4 indicates that it applies "[u]nless the conduct is covered under some other provision of law providing greater punishment" (emphasis added). The murder and kidnapping statutes at issue in *Fernandez* contained no such clear language limiting how to apply the two provisions in tandem. We distinguish *Fernandez* on this basis.

Accordingly, we follow *Bailey* and conclude that we are not required to start and end our inquiry with a *Blockburger* analysis of elements. *Blockburger* is an aid to determining legislative intent in that it creates a presumption that, under *Missouri v. Hunter*, may be rebutted "by a clear indication of legislative intent." *Gardner*, 315 N.C. at 455, 340 S.E.2d at 709. We now proceed, therefore, to apply these principles here.

G.S. § 14-32

**[3]** The stated purpose of N.C. Gen. Stat. § 14-32 is to protect life or limb. *State v. Cass*, 55 N.C. App. 291, 304, 285 S.E.2d 337, 345, *disc.*

*review denied*, 305 N.C. 396, 290 S.E.2d 366 (1982). The legislature intended to "create a new offense of higher degree than the common law crime of assault with intent to kill." *State v. Jones*, 258 N.C. 89, 91, 128 S.E.2d 1, 3 (1962). Whereas the common law offense carried a fine or imprisonment, or both, in the discretion of the court, G.S. § 14-32 carries a stricter punishment. *Id.*

Under Section 14-32, an assault with a deadly weapon that inflicts serious injury is a Class E felony. The courts of this state have declined to define serious injury for purposes of assault prosecutions other than stating that the term means physical or bodily injury resulting from an assault, *State v. Alexander*, 337 N.C. 182, 188, 446 S.E.2d 83, 87, and that "[f]urther definition seems neither wise nor desirable," *Jones*, 258 N.C. at 91, 128 S.E.2d at 3. In *State v. Hedgepeth*, 330 N.C. 38, 409 S.E.2d 309 (1991), the Supreme Court explained:

> Whether a serious injury has been inflicted depends upon the facts of each case and is generally for the jury to decide under appropriate instructions. A jury may consider such pertinent factors as hospitalization, pain, loss of blood, and time lost at work in determining whether an injury is serious. Evidence that the victim was hospitalized, however, is not necessary for proof of serious injury.

*Id.* at 53, 409 S.E.2d at 318 (internal citations omitted).

G.S. § 14-32.4

In 1996, the General Assembly enacted G.S. § 14-32.4, which makes an assault inflicting serious bodily injury a Class F felony "[u]nless the conduct is covered under some other provision of law providing greater punishment." N.C. Gen. Stat. § 14-32.4. The General Assembly also expressly defined what it meant by the term "serious bodily injury" as follows: " 'Serious bodily injury' is defined as bodily injury that creates a substantial risk of death, or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization." N.C. Gen. Stat. § 14-32.4. This Court has described the legislative intent in enacting § 14-32.4: "[W]e conclude that the General Assembly intended for N.C.G.S. § 14-32.4 to cover those assaults that are especially violent and result in the infliction of extremely serious injuries, and are not covered by some other provi-

sion of law providing for greater punishment." *State v. Williams*, 150 N.C. App. 497, 503, 563 S.E.2d 616, 619 (2002).

Accordingly, we believe that the legislature intended that G.S. § 14-32.4 make certain that conduct resulting in serious bodily injury, as defined, be punished at least at the Class F level, as the provision's plain language makes abundantly clear. Defendant was indicted and convicted under G.S. § 14-32, a Class E felony. A Class E felony carries a more severe punishment than the Class F felony in G.S. § 14-32.4.[1] Thus, because defendant's conduct is "covered under some other provision of law providing greater punishment," we conclude that the court cannot convict and sentence him for both §§ 14-32 and 14-32.4 for the same conduct without violating the double jeopardy provisions of the United States and North Carolina constitutions.

CONCLUSION

Because we believe that G.S. § 14-32.4 is clearly an alternative to other provisions, we arrest judgment in case no. 01 CRS 2881 and remand for entry of judgment in case no. 01 CRS 920.

Reversed and remanded.

Judges MARTIN and STEELMAN concur.

---

1. In conducting this analysis, we do not address defendant's status as a habitual felon. Although his status ultimately requires that defendant be sentenced as a Class C felon for both offenses, N.C. Gen. Stat. § 14-7.6, the enhancement is imposed after he has been convicted and sentenced for the underlying offenses, N.C. Gen. Stat. §§ 14-7.5 & 7.6. Accordingly, we base our analysis on the original class of the underlying offenses.